Filed 3/2/26  P. v. Baltazar CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ERNESTO BALTAZAR,<br><br>    Defendant and Appellant. | G063884<br><br>(Super. Ct. No. 09NF1820)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Terri K. Flynn-Peister, Judge. Affirmed.

Deanna L. Lopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

## INTRODUCTION

In 2015, Ernesto Baltazar was convicted, pursuant to a negotiated plea agreement, of voluntary manslaughter in connection with the shooting death of Hector Bautista. In 2022, Baltazar filed a petition for resentencing pursuant to Penal Code section 1172.6.[1] After conducting an evidentiary hearing under section 1172.6, subdivision (d), the trial court denied Baltazar's resentencing petition on the ground that he had aided and abetted the killing of Bautista with an intent to kill.

Baltazar appeals from the order denying his petition for resentencing. He contends substantial evidence does not support the trial court's findings that he aided and abetted the killing of Bautista or did so with an intent to kill. We conclude substantial evidence supports a finding that at the time Baltazar's plea was entered, he could have been guilty beyond reasonable doubt of aiding and abetting an express malice murder under current law. We therefore affirm.

## FACTS

These facts are taken from the preliminary hearing transcript, a transcription of a videorecorded police interview of Baltazar, and the testimony of Elizabeth Caufman, Ph.D., given at the evidentiary hearing.

South Side Krooks (SSK) and Barrio Small Town (BST) are rival gangs in Anaheim. SSK's claimed territory abuts that of BST. Baltazar and his family lived in a home on Claudina Street in an area claimed by both gangs.

[1] Further code references are to the Penal Code.

Baltazar and his brother Jose Baustista (Jose) were associated with SSK.[2] Baltazar had been friends with Peter Lara and Eric Lara, but they later joined BST.

In May or June 2009, Baltazar's father was the victim of a drive-by shooting carried out by BST members. Baltazar's father was struck in the leg and had to be hospitalized. The vehicle used in the shooting was a gray Ford Ranger truck (the Ford truck). The same truck was used by BST members to conduct another drive-by shooting, this one targeting Baltazar. During the shooting, someone from inside the truck yelled "Small Town."

On June 26, 2009, the same Ford truck was used by BST members in an attempt to run over Baltazar's younger brother, Jesus. In response, Baltazar, his brother Jose, and two others connected with SSK (Edgar Garcia and Ivan Rodriguez[3]), decided to drive Garcia's Cadillac Escalade (the Escalade) into BST territory, find the driver of the truck, and "fuck him up." Garcia drove, Jose sat in the front passenger seat, Baltazar sat behind the driver in the left side rear seat, and Rodriguez sat in the right side rear seat.

Garcia drove to the home of Eric Lara and Peter Lara on South Olive Street in Anaheim, which was widely known as a BST hangout. They arrived at the alley behind the Lara home, where they saw three men and one woman standing in the alley. Baltazar and his group "talk[ed] shit" and

[2] Anaheim police officer Kelly Phillips, a prosecution gang expert, testified that, in his opinion, Baltazar and his brother Jose were active participants in SSK on June 26, 2009. Phillips testified that Baltazar had a MySpace account on which he had posts indicating he was associated with SSK. Baltzar admitted in a police interview that he was associated with SSK but "never banged or nothing."

[3] Rodriguez has an SSK tattoo on his chest.

someone from inside the Escalade yelled, "SSK." Rodriguez believed he saw Bautista, an active BST participant or member, open his shirt to display a handgun.

Jose instructed Garcia to drive back to the Baltazar home on Claudina Street in order for Jose to get a gun. At the Baltazar home, Jose retrieved a gun and Baltazar grabbed a bat.[4]

At around 9:00 p.m., Garcia drove Baltazar, Jose, and Rodriguez back to the alley behind the Lara home, where a small group of people were gathered. Baltazar saw a gray truck which he believed had been the truck involved in the prior drive–by shootings and the attempt to run over Jesus. Baltazar hopped out of the Escalade, ran up to the Ford truck, and used the bat to smash the truck's windows.

Baustista, who owned the Ford truck, approached the Escalade and began arguing with its occupants. Jose, who was still sitting in the front passenger seat, rolled down the window and shot Bautista in the chest. Bautista stumbled, fell to the ground, and said, "'they shot me.'" Someone from inside the Escalade yelled, "'SSK.'"

Baltazar jumped into the Escalade and Garcia drove everyone back to the Baltazar home. During the drive, Baltazar announced, "I cracked that fool's windows."

Within two to three minutes, police officers arrived at the scene and found Bautista lying on his back with a gunshot wound to his chest. A

---

[4] In the police interview, Baltazar initially said he had taken a pipe from the house. Later he said, "to be honest, it wasn't a pipe, it was a bat."

police officer asked, "'who did this.'" A woman at the scene replied, "'the Baltazar Brothers.'" Bautista died from his wound.

During a recorded police interview, Baltazar said he was running back to the Escalade after smashing the windows of the Ford truck when he heard a gunshot. Baltazar said that when he heard the gunshot, he ducked because he did not see who fired the shot, did not know if "they were shooting back," and did not want to be hit. Baltazar stated the commission of a drive-by shooting by a rival gang was a "green light" and that he and his cohorts went to the Lara home to retaliate against BST for trying to run over his brother. Baltazar admitted he knew that when they went back to his house before the shooting, that whoever retrieved the gun would use it to "get homeboy back."

At the evidentiary hearing, Baltazar's counsel called Elizabeth Cauffman, Ph.D., to testify as an expert in adolescent brain development and psychology. Cauffman is a professor of psychological science at University of California, Irvine. She testified about the adolescent brain and cognitive processes. She explained that psychiatrists "demarcate" adolescent years into four periods: (1) 10 to 12 years is early adolescence; (2) 13 to 15 years is middle adolescents, (3) 16 to 19 years is late adolescence, and (4) 20 to 25 years is adulthood or "'transitional age youth.'" Baltazar, who was born in December 1992, was 16 years old in June 2009, and therefore was in late adolescence under this demarcation.

Caufman presented a power point presentation on the adolescent brain and changes that occur over time. Cauffman testified to several important points regarding adolescent cognition, impulses, and risk taking. First, she testified that teenagers rely on the "primitive" part of their brain (the amygdala) rather than more advanced part (the prefrontal cortex) as adults do. As a consequence, teenagers react more impulsively than adults.

Teenagers will, for example, approach a threat rather than withdraw from it. Second, Cauffman testified, teens are more prone to take risks and succumb to peer pressure, particularly in the presence of their friends. Third, Cauffman testified reliance on the primitive system causes adolescents to misread a cue or an emotional situation, particularly in charged or negative emotional stress situations.

## PROCEDURAL HISTORY

### I.

### Charges and Guilty Plea to Manslaughter

Baltazar was charged by information with one count of murder (§ 187, subd. (a), count 1), one count of street terrorism (§ 186.22, subd. (a), count 2), and one count of voluntary manslaughter (§ 192, subd. (a), count 3). As to the murder count, it was alleged the murder was committed by means of discharging a firearm from a motor vehicle (§ 190.2, subd. (a)(21)) and to further the activities of a criminal street gang purpose (§ 190.2, subd. (a)(22)). Enhancements were alleged for criminal street gang activity (§ 186.22, subd. (b)(1)), gang member vicarious discharge of a firearm causing death (§ 12022.53, subds. (d), (e)(1)), discharge of firearm from vehicle (§ 12022.55), and personal use of firearm (§ 12022.5, subd. (a)).

In March 2015, Baltazar entered into a negotiated plea agreement. He pleaded guilty to street terrorism (count 2) and voluntary manslaughter (count 3) and admitted the personal use of firearm enhancement allegations. Baltazar offered the following as the factual basis for the plea to voluntary manslaughter: "On June 26, 2009, I willfully and unlawfully aided and abetted the unlawful killing of another human being, Hector Bautista, Jr., I acted without malice and upon a sudden quarrel.

6

During the above offense I personally used a firearm." He was sentenced to a total of 31 years in prison.

## II.

### Resentencing Petition

In August 2022, Baltazar filed a form petition for resentencing pursuant to section 1172.6. He checked the boxes for the standard allegations. Baltazar was appointed counsel. The District Attorney filed a response to Baltazar's petition and requested the trial court find that Baltazar had met his prima facie burden and issue an order to show cause.

The trial court issued an order to show cause and, in January and March 2024, conducted an evidentiary hearing on Baltazar's resentencing petition. The court received into evidence a two-volume transcript of the preliminary hearing, a video recording and transcripts of Baltazar's police interview on June 27, 2009, crime scene and autopsy photographs, Bautista's death certificate, a copy of the PowerPoint presentation given by Dr. Caufman, and a copy of Baltazar's plea agreement form. Live testimony was presented by Dr. Caufman.

At the conclusion of the hearing, the trial court denied Baltazar's resentencing petition. The court ruled that Baltazar's statement in the factual basis for his plea that he acted without malice did not preclude the prosecution from contending Baltazar could presently be convicted of murder or attempted murder notwithstanding the changes made to sections 188 and 189.

The court stated it had considered Dr. Cauffman's testimony and recognized Baltazar was 16 years old at the time of the offense. The court commented that lack of impulse control and susceptibility to peer pressure "is more [relevant] in a reckless indifference, major participant" case than in a

7

direct aiding and abetting case. The court found that Baltazar had participated in a "collective effort to get the BST guys for the running over of the brother and the shooting of the father" and had "a specific role in going back to the house, getting a bat. ....." The court found too that after retrieving the bat and gun from the house, Baltazar and the other participants went "back with an intent to do a shooting" and "there was a direct aiding and abetting in going to that house to retaliate and shoot up with an intent to kill."

## DISCUSSION

### I.

### Resentencing Under Section 1172.6

By legislation effective January 1, 2019, the Legislature amended the felony-murder rule and eliminated the natural and probable consequences theory of liability as a basis for a murder conviction. (Sen. Bill No. 1437 (2017–2018 Reg. Sess.) Stats. 2018, ch. 1015, § 4; see *People v. Reyes* (2023) 14 Cal.5th 981, 984 (*Reyes*).) The felony murder rule was amended "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); see § 189, subds. (a), (3).) Section 188 was amended to provide that, except in cases of felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought." (§ 188, subd. (a)(3), as amended by Stats. 2018, ch. 1015, § 2.)

Section 1172.6 creates a procedural mechanism by which those convicted of murder, attempted murder, or manslaughter who could not be convicted under of murder or attempted murder under the law as amended

8

could retroactively seek relief. (*People v. Lewis* (2021) 11 Cal.5th 952, 957.) Section 1172.6 provides, "[a] person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts." (§1172.6, subd. (a).)

To obtain relief under section 1172.6, a petitioner must file a petition alleging these three conditions have been met: (1) the petitioner was convicted based on a pleading "that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" (§ 1172.6, subd. (a)(1)); (2) the petitioner was convicted of murder, attempted murder, or manslaughter following a trial or plea agreement (*id.*, subd. (a)(2)); and (3) the petitioner could not now be convicted of murder or attempted murder as those offenses are presently defined (*id.*, subd. (a)(3).)

If the court determines the petitioner has made a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold a hearing "to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced." (§ 1172.6, subd. (d)(1).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the

9

petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (*Id.*, subd. (d)(3).) At the evidentiary hearing, the resentencing court sits as an independent fact finder. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.)

If the prosecution does not sustain its burden of proof under section 1172.6, subdivision (d)(1), then the court must vacate the prior conviction and any allegations and enhancements attached to that conviction and resentence the petitioner on the remaining charges. (§ 1172.6, subd. (d)(3).)

"[T]he Legislature's aim in the manslaughter context was to make relief available to defendants who were convicted by plea or trial at a time when the prosecution could have pursued a murder charge, but the only way of doing so would have been a now invalid theory of imputed malice." (*People v. Lezama* (2024) 101 Cal.App.5th 583, 590.) Thus, a petitioner who entered a guilty plea to manslaughter is eligible for resentencing under section 1172.6 only if, at the time the plea was entered, the petitioner could have been guilty of murder only by imputation of malice. (*Lezama, supra*, at p. 590.)

## II.

## Standard of Review

A trial court's denial of a section 1172.6 petition following a hearing under section 1172.6, subdivision (d) is reviewed under the substantial evidence standard. (*Reyes, supra,* 14 Cal.5th at p. 988.) We review the record in the light most favorable to the order denying the petition to determine whether the evidence is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a

10

reasonable doubt. (*Ibid.*) "'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'" (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

We imply any findings necessary to support the trial court's order. (*People v. Therman* (2015) 236 Cal.App.4th 1276, 1279; *People v. Francis* (2002) 98 Cal.App.4th 873, 878.) "[W]e defer to the trial court's implicit credibility findings and accept all reasonable inferences from the evidence." (*People v. Oliver* (2023) 90 Cal.App.5th 466, 482.)

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the [fact finder]'s verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

### III.
### Substantial Evidence Supports the Trial Court's Finding That Baltazar Could Have Been Guilty of Aiding and Abetting Express Malice Murder

A. *Principles of Malice and Aiding and Abetting Murder*

The trial court denied Baltazar relief on the ground the evidence established he aided and abetted the murder of Bautista with "an intent to kill"; that is, express malice murder.[5] Because Baltazar pleaded guilty to voluntary manslaughter, and he was not the perpetrator, the issue presented is whether substantial evidence supports a finding that, at the time that plea

---

[5] The trial court did not address and made no findings on a theory of aiding and abetting an implied malice murder. It does not appear the district attorney's office argued an alternate theory of aiding and abetting an implied malice murder.

11

was entered, he could have been guilty beyond reasonable doubt of aiding and abetting an express malice murder.

Malice may be express or implied. (§ 188, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (*Ibid.*) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Ibid.*)

"'[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.]'" (*Reyes, supra,* 14 Cal.5th at pp. 990–991.) Direct aiding and abetting liability requires proof of (1) "'the direct perpetrator's actus reus—a crime committed by the direct perpetrator,'" (2) "'the aider and abettor's mens rea'" and (3) "'the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.'" (*People v. Curiel* (2023) 15 Cal.5th 433, 467.) "[A]n aider and abettor's mental state must be at least that required of the direct perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118 (*McCoy*).)[6]

A defendant is liable as a direct aider and abettor of express malice murder if the defendant aided or encouraged the murder with knowledge of the perpetrator's unlawful purpose and with the intent or

---

[6] For aiding and abetting express malice murder, the perpetrator's criminal purpose need not have been murder. (*McCoy, supra,* 25 Cal.4th at p. 1122.) "[W]hen a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea. If that person's mens rea is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator." (*Ibid.*)

purpose of committing, encouraging, or facilitating the commission of the murder. (*In re Lopez* (2023) 14 Cal.5th 562, 579; *McCoy, supra*, 25 Cal.4th 1111, 1122.) Thus, for express malice murder, the aider and abettor's mental state must be express malice and the aider and abettor must have known the perpetrator's criminal purpose. (*McCoy, supra*, p. 1118.)

As applied to this appeal, those principles mean that for Baltazar to be ineligible for relief under section 1172.6 based on express malice murder, substantial evidence must support a finding that beyond reasonable doubt he personally harbored express malice (*People v. Lopez* (2024) 99 Cal.5th 1242, 1848 ["a direct aider and abettor . . . must possess malice aforethought"]) and he knew "the criminal intent of the perpetrator," his brother, Jose (*McCoy, supra*, 25 Cal.4th at p. 1118 [the accomplice must know "'the full extent of the perpetrator's criminal purpose'"].)

B. *The Evidence*

Baltazar argues the evidence is insufficient to prove beyond reasonable doubt that he might have harbored express malice. We disagree. The record includes substantial evidence to support a finding that, beyond reasonable doubt, Baltasar intended to kill and knew of Jose's criminal intent.[7]

It cannot be reasonably disputed that the motive for killing Bautista was retaliation. The evidence established that BST members had

[7] As to the first element of aiding and abetting express malice murder—the perpetrator's actus reus—the evidence showed that Jose fired the gun and killed Bautista. As to Jose's mens rea, the record establishes that Jose acted with intent to kill. Jose aimed the gun at Bautista and shot him in the chest, killing him. "'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill.'"" (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

13

used the Ford truck owned by Bautista to conduct a drive–by shooting of Baltazar's father, a drive–by shooting of Baltazar, and an attempt to run over Baltazar's brother Jesus. Although the precise nature of Balatazar's relationship with SSK is disputed, Baltazar stated during the police interview that he associated with SSK. And, in Baltazar's words, BST and SSK had been "enemies forever." The attempt to run over Jesus was the last straw that prompted Baltazar, as well as Jose, Garcia, and Rodriguez to seek revenge and "fuck up" the driver of the truck.

When Baltazar and the group in the Escalade first drove off to the alley behind the Lara home, Rodriguez said "[let]'s go fuck him up"—referring to the driver of the Ford truck. At the alley, Baltazar and the others in the Escalade "talk[ed] shit" and yelled "SSK." Once it appeared that Bautista had a gun, Jose instructed Garcia to drive back to the Baltazar residence for the specific purpose of getting a gun. A reasonable inference is that Baltazar, who was a passenger in the Escalade, heard Jose so instruct Garcia.

Once at the Baltazar home, Jose retrieved a gun belonging to his father and Baltazar retrieved a bat. It is significant that after Jose retrieved the gun, Baltazar, Jose, Garcia, and Rodriguez drove back to the alley behind the Lara home. They obviously intended to do more than "talk shit" and yell: A reasonable inference is that the purpose for going back to the Baltazar home, retrieving the gun and bat, and then returning to the alley was to attack and kill the person who drove the Ford truck or someone else associated with BST. While it could be reasonably inferred that Jose retrieved the gun for defense, we must accept the inference supporting the trial court's decision. (*People v. Oliver, supra*, 90 Cal.App.5th at p. 482.)

During his police interview, Baltazar made or agreed with five inculpatory statements from which express malice and knowledge of Jose's

14

criminal purpose could reasonably be inferred. First, when asked "[w]hat's the consequence of doing a drive-by," Baltazar answered, "Green Light." Baltazar agreed the green light "rule" had been around for a long time and everyone knew it. Second, Baltazar said the attempt to run over his brother was an act of disrespect and, when asked "so your intentions were to go back there and retaliate for the act of disrespect[ing] you," Baltazar replied, "yeah." Third, when pressed to admit he knew somebody else had retrieved something from Baltazar's house, Baltazar said, "if that's the gun, or whatever, well then I guess, yeah. Somebody grabbed it, but other than that, you know, I don't know." Fourth, also in reference to the gun, he said, "picking up, dropping off. Right. That's true, whatever. But where, I don't know where the fuck they stashing it."

Fifth, and most critically, Baltazar replied "[w]ell yeah" when asked, "you guys knew, and you guys knew when you went back to the house the first time, that whoever got the gun, kept the gun for the purpose of going out to, to get homeboy back. Right?"

Those passages from the police interview establish that Baltazar knew Jose had a gun. Baltazar's statement that "picking up, dropping off" the gun was true is evidence indicated he knew Jose had a gun. Indeed, it was no secret that Jose had a gun: During police interviews, Rodriguez said Jose had retrieved a gun from the Baltazar residence and Garcia said he believed that when Jose returned to the Escalade he had a firearm. Baltazar's agreement with the statement that he knew "somebody got the gun," along with evidence that the gun belonged to Baltazar's father, the gun was kept at his home, and Baltazar and Jose were the ones who got out of the Escalade and went into their home to retrieve the bat and the gun, supports a reasonable inference that Baltazar knew Jose had the gun.

15

By describing the attempt to run over his brother as an act of disrespect, and by agreeing with the statement that his intention was to retaliate for that act of disrespect, Baltazar confirmed he had a personal motive for retaliation. That Baltazar had a personal motive is "inferentially relevant to . . . disputed issues of intent." (*People v. Rogers* (2006) 39 Cal.4th 826, 862; see *People v. Roldan* (2005) 35 Cal.4th 646, 707 ["evidence of motive makes the crime understandable and renders the inferences regarding intent more reasonable"], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.th4 390m 421, fn. 22.)

A person on a "green light" is subject to attack by a gang member. (*People v. Pineda* (2022) 13 Cal.5th 186, 229.) Although attack does not necessarily mean killing, here, Jose retrieved a gun from his home and, as Baltazar admitted, whoever had the gun was going to use it to "get homeboy back." Baltazar agreed with the statement that "you guys"—meaning Baltazar, Jose, Garcia and Rodriguez—knew whoever got the gun was going to fire it ("use it") to retaliate ("get homeboy back").. A reasonable inference is that the gun was going to be used to shoot and kill the person who drove the Ford truck in retaliation for the attacks on Baltazar, his father, and his brother.

The evidence is thus reasonably susceptible to the inferences that Baltazar intended to kill and knew, at least, that Jose harbored a criminal intent of firing the gun at someone in the alley "to get homeboy back." Those inferences, which under the standard of review we must draw, support the trial court's denial of Baltazar's resentencing petition.

The evidence was also sufficient to support a finding of an actus reus. The Attorney General argues Baltazar smashed in the windows of the truck in order to provoke a confrontation or to lure Bautista out so that Jose

16

could shoot him. The trial court declined to find that Baltazar's role was to lure out BST members. It is not unreasonable, however, to infer that Baltazar's role was to provoke a confrontation or to lure Bautista out (see *People v. Clark* (2016) 63 Cal.4th 522, 626–627 [aiding and abetting included luring the victim to murder location].) In any case, Baltazar aided and abetted the murder of Bautista by identifying the Ford truck used by BST members in the attacks and, armed with a bat, by serving as protection, if necessary, for Jose, Garcia, and Rodriguez.

Baltazar points to evidence that he, Garcia, and Rodriguez were surprised and confused when they heard the gunshot and believed they perhaps were the intended targets. During the police interview, Baltazar said he was running back to the Escalade after smashing the windows of the gray truck when he heard the gunshot. Baltazar also points to evidence that he expressed disbelief when, during his police interview, he was told Bautista had died.

However, in a sufficiency of the evidence review, we affirm if substantial evidence supports the order or judgment being appealed even if contrary evidence would support reversal. (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639; *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 233; see *In re Miguel R.* (2024) 100 Cal.App.5th 152, 169 ["the existence of contrary evidence does not show that the trial court's findings were not supported by substantial evidence"].) Moreover, the trial court was the sole judge of witness credibility. (*People v. Alvarez* (2025) 18 Cal.5th 387, 470.) The trial court impliedly found that Baltazar, who lied and was evasive through most of the police interview, was not being truthful in saying he was surprised when he heard the gunshot and in expressing disbelief when told Bautista had died.

Baltazar admonishes us that in assessing the trial court's reliance on gang findings not to ignore the Legislature's concerns expressed in Assembly Bill No. 333, which "altered existing law regarding gang crimes and enhancements in various ways." (*People v. Aguirre* (2025) 18 Cal.5th 629, 714.)[8] The trial court concluded, Assembly Bill No. 333 does not apply here because it applies retroactively only to cases that were not yet final on its effective date of January 1, 2022. (*People v. Cardenas,* (2025) 18 Cal.5th 797, 817.) In any event, without reference to gang expert testimony, other evidence, including Baltazar's own statements and gestures made during the police interview, provide sufficient evidence to uphold the order denying Baltazar's petition for resentencing. Whatever might have been the nature of BST and SSK—whether they were criminal street gangs or charitable

[8] As explained in *Aguirre*, Assembly Bill No. 333 "'narrowed the definition of a "pattern of criminal [gang] activity" by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang "members," as opposed to just "persons"; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) . . . Assembly Bill 333 [also] narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any "common benefit" be "more than reputational." (§ 186.22, subd. (g).)'" (*People v. Aguirre,* (2025) 18 Cal.5th 629, 714.)

18

organizations—Baltazar said they were enemies, he associated with SSK, and he, Jose, Garcia, and Rodriguez intended to retaliate against BST.[9]

Baltazar argues that in light of Caufman's testimony, "[Baltazar]'s understanding as to why Jose obtained the gun and how he intended to use it, . . . cannot readily be gleaned by making an inference as to what an adult in the same emotionally charged circumstance would have understood" and "[Baltazar]'s specific intent can only be assessed with these developmental limitations in mind." The trial court was, of course, the sole judge of witness credibility, and we must presume any implied findings and draw all inferences in favor of the court's decision. The trial court heard and considered Caufman's testimony and was in the better position to decide how it should affect an assessment of the evidence.

In conclusion, we cannot say "'upon no hypothesis whatever is there sufficient substantial evidence to support'" the order denying Baltazar's petition for resentencing. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

[9] The trial court stated that although it would consider the gang expert's testimony, it did not need to rely on that testimony because Baltazar's police interview was enough to establish that Baltazar associated with SSK and was with SSK members. The court stated it did not need to specifically find that SSK was as criminal street gang in order to make a determination on malice.

## DISPOSITION

The order denying Baltazar's petition for resentencing is affirmed.


SANCHEZ, J.

WE CONCUR:


MOTOIKE, ACTING P. J.


SCOTT, J.